**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Jim J. Wyatt, | : | Case No. 3:07 CV 2870 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying his application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. §§ 1381 and 405(g). Pending are Briefs on the Merits filed by the parties and Plaintiff's Reply (Docket Nos. 16, 17 and 18). For the reasons set forth below, the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

**PROCEDURAL BACKGROUND**

Plaintiff applied for SSI on April 28, 2004, alleging that his disability began on March 15, 2001 (Tr. 34-36). The application was denied initially and on reconsideration (Tr. 12, 20-21, 30H-30J). Plaintiff's request for a hearing was granted and the hearing was held in Toledo, Ohio, on September 14, 2006, by Administrative Law Judge (ALJ) Yvonne Stam (Tr. 176). Plaintiff, represented by counsel

Barbara Lavender, and Vocational Expert (VE) Charles McBee appeared and testified. On December 26, 2006, the ALJ rendered an unfavorable decision finding that Plaintiff was not disabled as defined under the Act (Tr. 12-18). Plaintiff requested review of the hearing decision on February 23, 2007 (Tr. 8). The Appeals Council denied Plaintiff's request for review on July 26, 2007, thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 3-5).

## JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## FACTUAL BACKGROUND

*Plaintiff's Testimony*

Plaintiff testified at the administrative hearing that he resides in Toledo, Ohio, with his girlfriend. He had not worked since he filed an application for SSI benefits on April 29, 2004 (Tr. 179). Plaintiff was an iron worker who suffered a crush injury. He lost his leg in 1994 and acquired a prosthesis (Tr. 182). His attorney reported that he had a period of disability from 1994 to 1999 when he returned to work as a security guard. Plaintiff's leg was prone to collapsing and his arthritic hands cramped for most of the day (Tr. 179, 181). He suffered from degenerative joint disease in his right knee (Tr. 183).

Plaintiff was prescribed pain medication to ease his back and leg discomfort. The pills caused drowsiness, dizziness and hallucinations (Tr. 180). Reducing the dosage of Plaintiff's pain medication failed to eliminate his hallucinations (Tr. 181).

Plaintiff estimated that he could only stand or walk for up to five minutes each (Tr. 179-180). The pain in his back was exacerbated by sitting (Tr. 180). He claimed that he could not lift more than

ten pounds (Tr. 181).

During a typical day, Plaintiff arose at 10:30 A.M., ate breakfast, bathed and watched television for an hour "or so" and slept until about 3:30 in the afternoon. He then watched television until about 7:30 p.m. After dinner, he returned to bed. He slept throughout the night, with a bathroom break about 11:30 p.m. (Tr. 182).

*VE Testimony*

The VE testified that an individual of Plaintiff's age, education, past work experience and exertional limitations of lifting twenty pounds occasionally, ten pounds frequently, standing and walking at least six hours in an eight-hour workday and sitting about six hours in an eight-hour workday, could not perform any of Plaintiff's past relevant work. That individual could, however, perform light work such as a machine feeder, photocopy machine operator and microfilm processor. There were 1,000 to 1,500 machine feeder jobs, 750 photocopy machine operator jobs and 400 to 500 microfilm processor jobs that existed. These jobs could be performed with a sit/stand option. Missing more than one day of work per month beyond the allotted vacation and sick leave would not be tolerated. In competitive employment, production for 80% of the workday is expected (Tr. 185).

## MEDICAL EVIDENCE

**The Veteran's Hospital (Tr. 77-108, 124-125, 126-170).**

Tests measuring glucose and cholesterol levels administered on February 20, 2003, showed glucose levels within a normal range (Tr. 106). However, Plaintiff's cholesterol level was within the range ideal for minimal cardiac risk (Tr. 107, 108). Dr. Paul Otis examined Plaintiff's lungs, heart and foot care on February 25, 2003. No abnormalities were observed (Tr. 101). Plaintiff's glucose level was elevated on July 10, 2003 (Tr. 106). A two-question depression screen performed on November 18,

2003, showed negative results (Tr. 91). Although his prosthesis was loose in December 2003, Dr. Robert A. Werner suggested that Plaintiff get his weight under control before making an adjustment (Tr. 90).

New pain medication was prescribed on February 18, 2004 (Tr. 85-86). In March, Plaintiff was diagnosed with moderate to severe periodontitis (Tr. 81). Dr. Robert A. Werner ordered a new prosthesis in September 2004 (Tr. 167).

In January 2005, Plaintiff was wearing the new prosthesis all day and standing/walking for up to 2½ hours per day (Tr. 163). On February 18, 2005, the results of the diabetic foot exam were abnormal (Tr. 161). In June 2005, Plaintiff was treated for an infection with drug therapy (Tr. 157). Plaintiff had two teeth extracted on August 10, 2005 (Tr. 152-155). Plaintiff was evaluated for a scooter on September 29, 2005. Since Plaintiff had no upper body impairments and he was able to ambulate distances, he was not eligible for a scooter (Tr. 144-145). A wheelchair was ordered for Plaintiff and delivered on November 17, 2005 (Tr. 143). Plaintiff was instructed on how to measure his blood sugar and administer insulin on November 17, 2005 (Tr. 140). Dr. Otis opined on December 15, 2005, that Plaintiff could only tolerate his ill-fitting prosthesis for no longer than two hours, that he would have to take up to eight breaks during the average work day and that he would have to rest for more than ten minutes before returning to work (Tr. 125).

An education assessment completed on February 7, 2006, showed that Plaintiff had a "good" readiness to learn to administer his medications (Tr. 138-140). Plaintiff underwent oral surgery on March 3, 2006 (Tr. 135-136). On May 9, 2006, Plaintiff received comprehensive instructions regarding his current medications (Tr. 130-132). Plaintiff's foot screening showed normal results. Plaintiff complained that his pain was not relieved with the prescribed analgesic. A stronger pain reliever was

4

prescribed. On June 30, 2006, a complete ophthalmological examination was conducted to observe the effects of his diabetic neuropathy on his eyesight. The results of the tests were normal (Tr. 126, 128).

**Dr. William D. Padamadan (Tr. 109-116).**

Dr. Padamadan conducted an internal medicine evaluation on June 22, 2004. He diagnosed Plaintiff with obesity, non-insulin dependent diabetes, hypertension, below knee amputation and history of arthritis. He determined that Plaintiff's hearing, speech and communication skills were normal. His upper extremity functions for reaching, handling and manipulation were intact. However, his ability to climb poles, ladders or stairs was limited because of the prosthesis (Tr. 112). Plaintiff's range of motion in his cervical spine, shoulders, elbows, hips, wrists and hand/fingers was within a normal range (Tr. 114-116). The prosthetic knee affected the range of motion in both knees and his left ankle (Tr. 116).

**Dr. Eli Rubenstein (Tr. 117).**

The X-ray of Plaintiff's chest showed, *inter alia*, normal soft tissue and a normal rib cage. Plaintiff's lung fields were clear and the aorta was normal. Overall, Plaintiff's chest X-ray showed normal results.

**Dr. Lynne B. Torello (Tr. 118-123).**

In her opinion, Plaintiff could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk approximately six hours in an eight-hour workday, sit about six hours in an eight-hour workday and engage in unlimited pushing and pulling (Tr. 119). Plaintiff could never climb using a ladder/rope/scaffold, kneel or crawl but could occasionally climb a ramp/stairs, stoop or crouch (Tr. 120). There was no evidence of manipulative, visual, communicative or environmental limitations (Tr. 120-121).

## **STANDARD OF DISABILITY**

The Act requires the Secretary to follow a "five-step sequential process" for claims of disability. *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, Plaintiff must demonstrate that he/she is not currently engaged in "substantial gainful activity" at the time he/she seeks disability benefits. *Id. (citing* 20 C.F.R. §§ 404.1520(b) and 416.920(b) (2000)). Second, Plaintiff must show that he/she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." *Id. (citing* 20 C.F.R. §§ 404.1520(c) and 416.920(c) (2000)). Third, if Plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, Plaintiff is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d) (2000). Fourth, if the Plaintiff's impairment does not prevent him/her from doing his/her past relevant work, Plaintiff is not disabled. For the fifth and final step, even if the Plaintiff's impairment does not prevent him from doing his past relevant work, if other work exists in the national economy that Plaintiff can perform, Plaintiff is not disabled. *Abbot*, 905 F.2d at 923.

Medical-Vocational Guidelines (grids) are utilized by the Secretary during the final step of the disability decision. *Id.* After the Secretary determines that the Plaintiff is incapable of performing past relevant work, these grids are used to determine whether Plaintiff can perform other jobs in the national economy. The grid allows the Secretary to take "administrative notice" that Plaintiff has met the requirements to perform certain jobs in the economy. *Id.*

## **ALJ'S DETERMINATIONS**

Employing the standard of disability, the ALJ considered the testimony adduced at the hearing and the medical evidence set forth above and made the following findings:

1. Plaintiff had not engaged in substantial gainful activity since March 5, 2001.

2. Plaintiff had severe impairments, namely, status post below knee amputation, diabetes mellitus, osteoarthritis of the shoulders and knees, hypertension and chest pain with shortness of breath. These medically determinable impairments did not meet or medically equal one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

3. Plaintiff was unable to perform any past relevant work.

4. Plaintiff was 47 years of age on the alleged disability onset date, he had at least a high school education and was able to communicate in English. Considering these demographics and his residual functional capacity to perform the demands of work at the level of light exertion, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

5. Plaintiff was not under a disability as defined under the Act from August 21, 2002 through the date of this decision. 20 C.F.R. § § 404.1520 (g) and 416.920(g) (Thomson Reuters/West 2008).

(Tr. 14-18).

This decision became the final decision of the Commissioner on July 26, 2007, when the Appeals Council denied review.

## STANDARD OF REVIEW

Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Cutlip v. Secretary of Health and Human Services*, 25 F. 3d 284, 286 (1994) (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir.1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id*. (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983), and even if substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## **DISCUSSION**

First, Plaintiff contends that the ALJ erred as a matter of law in failing to apply the Medical Vocational Guidelines (Grids) properly. Specifically, the ALJ applied Rule 202.20. The ALJ should have applied Rule 201.12. Next Plaintiff argues that the ALJ made factual errors that affected the outcome of the hearing. In particular, the ALJ overlooked the prescription for a wheel chair in assessing Plaintiff's residual functional capacity. Then Plaintiff argued that the ALJ failed to attribute controlling weight to the opinions of Dr. Otis or present all of his functional limits to the VE. Finally, Plaintiff argues in his Reply that a finding that he cannot perform his past relevant work is inconsistent with the finding that he could perform work requiring a level of light exertion.

I.

The Grids are utilized by the Secretary during the final step of the disability decision. *Heston v. Commissioner of Social Security,* 245 F.3d 528, 537 (6th Cir. 2001) (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)). After the Commissioner determines that the claimant is incapable of performing past relevant work, these grids are used to determine whether the claimant can perform other jobs in the national economy. *Id*. The grid allows the Commissioner to take "administrative notice" that plaintiff has met the requirements to perform certain jobs in the economy. *Id.*

The Grids provide a shorthand method of evaluating a claimant's vocational abilities-age, education, and work abilities. *Barcelona v. Astrue,* 2008 WL 321306, *2 fn. 3(S. D. Ohio 2008). When a claimant's functional abilities exactly meet the definition for a category of work such as sedentary, light or medium work, the Grids authorize the ALJ to take notice of the number of jobs available in the national economy. *Id.* When the claimant's characteristics do not exactly match the definition of the category of work, the claimant's residual functional capacity is used as the proper framework to determine whether he or she is disabled." *Id.* (*citing Templeton v. Commissioner of Social Security*, 215 Fed. Appx. 458, 463 (6th Cir. 2007) (citations omitted)).

Under Section 201.12, a high school graduate, closely approaching advanced age, with no previous work experience or unskilled work experience is considered disabled. 20 C. F. R. Pt. 220, App. 2. § 200.00, Table No. 1 (Thomson Reuters/West 2008). In this case, Plaintiff had a high school education and he had previous work experience as an iron worker. Thus Section 201.12 was not applicable.

The Magistrate finds that Section 202.20 was also not applicable because the ALJ erred in his assessment of Plaintiff's age. Under Section 202.20, the claimant's age is considered that of a younger individual. In the Sixth Circuit, the appropriate time for determining a claimant's age is the date of the ALJ's decision. *Maziarz v. Secretary of Health and Human Services*, 837 F. 2d 240, 244 (6th Cir. 1987) (*citing Varley v. Secretary of Health and Human Services*, 820 F. 2d 777, 780 (6th Cir. 1987)). On the date that the ALJ rendered his decision, Plaintiff had progressed to the category of approaching advanced age. Even though the ALJ incorrectly applied the Grids, the ALJ correctly relied on the testimony of the VE to sustain the burden of proof required at step five of the sequential evaluation (Tr. 18).

II.

Plaintiff claims that the ALJ overlooked his prescription for a wheelchair. Such prescription is critical to the determination of his residual functional capacity.

Residual functional capacity is the most a claimant can still do despite his or her limitations. 20 C.F.R. § 404.1545(a) (Thomson Reuters/West 2008). The claimant's residual functional capacity is assessed based on all relevant evidence in the case record. 20 C.F.R. § 404.1545(a)(3) (Thomson Reuters/West 2008). In particular, the ability to meet the physical, mental, sensory and other requirements of work will be assessed. 20 C. F. R. § 404.1545 (a)(4) (Thomson Reuters/West 2008). The claimant is responsible for providing the evidence used to make a finding about residual functional capacity. 20 C.F.R. § 404.1545(a)(3) (Thomson Reuters/West 2008).

However, before a determination may be made that the claimant is not disabled, the Commissioner is responsible for developing the claimant's complete medical history, including arranging for a consultative examination if necessary, and making every reasonable effort to help the claimant obtain medical reports from the claimant's own medical sources. 20 C.F.R. § 404.1545(a)(3) (Thomson Reuters/West 2008). In addition, the Commissioner will consider any statements about what the claimant can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. 20 C.F.R. § 404.1545(a)(3) (Thomson Reuters/West 2008).

At the time the wheelchair was prescribed, Plaintiff had an ill-fitting prosthesis. Plaintiff failed to present evidence from his medical sources that he was relegated to ambulating in a wheel chair for a year or more. Following delivery of a wheelchair in November 2005, Plaintiff was observed ambulating with a cane in February and May 2006 (Tr. 134, 137). In effect, there is no relevant evidence in the case record that the wheel chair was required to meet the physical, mental or sensory requirements of work.

The Magistrate cannot find that the prescription for a wheelchair, delivery of the wheelchair or its occasional use was imperative to the assessment of residual functional capacity.

III.

Plaintiff contends that the ALJ erred in failing to attribute appropriate weight to the treating physician opinions.

In assessing the medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007). Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Id.* (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004)). Because treating physicians are the medical source most able to provide a detailed, longitudinal picture of the claimant's medical impairments, they may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone. *Id.* Accordingly, the treating physician's opinions are generally accorded more weight than those of non-treating physicians. *Id.* (*citing* 20 C.F.R. § 416.927(d)(2)).

If the opinion of the treating physician as to the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," then it will be accorded controlling weight. *Id.* (*citing Wilson,* 378 F.3d at 544). When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

11

However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.  *Id.* (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *4).

There is an additional procedural requirement associated with the treating physician rule if the ALJ discounts the treating physicians' opinions.  Specifically, the ALJ must provide "good reasons" for discounting treating physicians' opinions, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.* (*citing* 1996 WL 374188 at *5).  The purpose of this procedural aspect of the treating physician rule is two-fold.  *Id.*  First, the explanation provides the claimant with an understanding about the disposition of his or her case particularly where a claimant knows that his or her physician has deemed him or her disabled.  *Id.* (*quoting Wilson*, 378 F. 3d at 544) (*quoting Snell v. Apfel*, 177 F. 3d 128, 134 (2nd Cir. 1999)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.  *Id.*

The ALJ did not contest that Dr. Otis was a treating source as defined under 20 C. F. R. § 404.1502.  However, the evidence does not support a conclusion that the ALJ erred in discounting Dr. Otis' opinions.  Dr. Otis identified himself as an attending physician, one physician among several physicians who treated Plaintiff when he presented to the Veteran's Hospital. Dr. Otis treated Plaintiff's primary symptoms associated with hyperlipidemia and he monitored Plaintiff's drug therapy (Tr. 91-92,

12

96-97, 101-102, 103-108, 129, 134, 137-138, 143-144, 158-162, 165-166). Dr. Otis treated Plaintiff once for edema emanating from an insect bite (Tr. 151). On one occasion, Dr. Otis recommended a dental consultation (Tr. 156-157). Clearly, the ALJ was not compelled to attribute significant weight to Dr. Otis' opinions simply because they are not supported by medically accepted evidence. He explained that since such opinions were not supported by evidence in the record, he did not attribute significant weight to these opinions. Since the ALJ followed the procedural rules required to discount an opinion of a treating source, the Magistrate does not disturb his finding that Dr. Otis' opinions were not entitled to controlling weight.

The other attending physicians cannot obtain treating physician status as their opinions are not well-supported by medically acceptable clinical and laboratory diagnostic techniques. Moreover, none of their medical reports provide a longitudinal picture of Plaintiff's medical impairments. Dr. Douglas L. Yoshino consulted with Plaintiff for the extraction of his teeth and subsequently extracted several teeth (Tr. 78-83, 152-155). Dr. Robert A. Werner monitored the modifications and fitting of Plaintiff's new prosthesis (Tr. 89, 90, 163, 167). Dr. Padamadan conducted a clinical interview on or about June 22, 2004, during which he gathered information for his diagnosis from Plaintiff's descriptions of disability and history and his medical records (Tr. 109-112; 113-116). Dr. Rubenstein performed an X-ray on June 22, 2004 (Tr. 117). Dr. Patricia M. Crum extracted some teeth on March 3, 2006 (Tr. 136). Dr. James Knaggs, an ophthalmologist, reviewed Plaintiff's' medical history before prescribing new glasses (Tr. 167-169). None of these physicians who treated Plaintiff once or on a limited basis have had sufficient contact with Plaintiff to obtain treating physician status. Thus, the ALJ was not required to attribute controlling weight to their opinions and/or evidence presented.

IV.

Plaintiff claims that the hypothetical question posed to the VE did not include all of his functional limitations. Specifically, the hypothetical question failed to include Plaintiff's specific mental and physical impairments.

Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairment in all significant, relevant aspects. *Culbertson v. Barnhart*, 214 F.Supp.2d 788, 798 (N. D. Ohio 2002) (*citing Varley, supra*, 820 F.2d at 779)). The hypothetical question is not erroneous where at least one doctor substantiates the information contained therein. *Hardaway v. Secretary of Health and Human Services*, 823 F. 2d 922, 927-928 (6th Cir. 1987).

The VE's testimony must be directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she or he "can and cannot do," there exists a significant number of employment opportunities for her or him in the regional and national economies. *Webb v. Commissioner of Social Security,* 368 F. 3d 629, 632 (6th Cir. 2004). The VE is not expected to evaluate the claimant's medical conditions in making this determination. *Id.* Indeed, VEs are not required to have any medical training, so any evaluation of medical evidence they perform would be outside their area of expertise. *Id.*

Under *Webb*, an ALJ is not expected to include a Plaintiff's physical or mental impairments in the hypothetical question as Plaintiff suggests. The ALJ complied by asking a hypothetical question that properly excluded Plaintiff's physical or mental impairments as suggested by Defendant. The ALJ was expected to pose a broader hypothetical question that considered Plaintiff's age, education, past relevant work experience and residual functional capacity. The ALJ did pose such hypothetical question to the VE that properly incorporated limitations that were supported by at least one physician. The Magistrate

14

cannot discount the ALJ's exclusion from the hypothetical, specific functional limitations affecting Plaintiff's hands, arms and ability to walk since none of the physicians can substantiate Plaintiff's claims. The ALJ was well within his authority to exclude these limitations from the hypothetical question posed to the VE.

V.

In his Reply, Plaintiff argues that the evidence in the record is inconsistent with the ALJ's finding that he can perform light work. The ALJ found that Plaintiff could not perform his past relevant work of security guard which was performed at a light exertional level. However, the ALJ adopted the VE's identification of work performed at the light exertional level that Plaintiff could perform.

Under the Act, a claimant is capable of performing a full or wide range of light work, if he or she has the ability to do substantially all of three of the following activities. First, the claimant must have the ability to lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Second, the claimant must be able to walk or stand a good deal. Third, if the claimant is sitting most of the time, some pushing and pulling of arm or leg controls is involved. 20 C.F.R. § 416.967 (b) (Thomson Reuters/West 2008).

Although the ALJ inquired of the VE about the possible necessity of the sit/stand option, the ALJ did not incorporate the VE's answer in assessing the jobs that Plaintiff could perform. However, the ALJ found at step four of the sequential evaluation that Plaintiff could not perform his past relevant work as a security guard. The Magistrate takes judicial notice that under the DICTIONARY OF OCCUPATIONAL TITLES (DICOT), the jobs of security guards are traditionally performed at least at the light exertional level in any industry. *See e.g.* DICOT 372.167-010; 372.167-014; 372.667-034;372.667-038; 372,667-030. However, the jobs recommended by the VE that Plaintiff can perform with his impairments requires

15

performance at the light exertional level. The finding that Plaintiff cannot return to his past relevant work which is performed at a light exertional level is inconsistent with his finding that Plaintiff can perform those jobs recommend by the VE, all of which are performed at the light exertional level. Assuming that the ALJ found that Plaintiff cannot return to his past relevant work, the ALJ failed to sustain his burden at step five of the sequential evaluation by suggesting that he could perform other work at the light exertional level. The case is remanded to the Commissioner to re-assess steps four and five of the five step sequential evaluation.

## **CONCLUSION**

For these reasons, this case is remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for a re-determination of steps four and five of the sequential evaluation.

So ordered.


   /s/ Vernelis K. Armstrong
United States Magistrate Judge


Date:   October 3, 2008